UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MELANIE A. M. HINDS, on behalf of herself,  :
and all similarly situated employees,  :
                                        :
                    Plaintiff,  :     Case No. 11 Civ. 3126 (AKH)
                                          :

            - against -  :

THE HOSPITAL FOR SPECIAL SURGERY,  :
a/k/a New York Society for the Relief of the  :
Ruptured and Crippled, Maintaining The  :
Hospital for Special Surgery,  :
                                          :
                    Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS IN THE FORM OF DISMISSAL OF PLAINTIFF'S LAWSUIT

Amy J. Traub
Jill Barbarino
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4812

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT FACTUAL AND PROCEDURAL HISTORY .......................................................4

ARGUMENT .............................................................................................................................9

I.    HINDS'S ADMITTED THEFT AND EXPLOITATION OF PRIVILEGED COMMUNICATIONS, WORK PRODUCT, AND CONFIDENTIAL DOCUMENTS WARRANT DISMISSAL OF HER LAWSUIT ......................... 9

    A.    The Court's Inherent Powers Provide It with the Discretionary Authority to Dismiss Hinds's Lawsuit Based Upon Her Admitted Misconduct ................................................................................................9

    B.    The Prejudice to HSS Caused By Hinds's Misconduct Can Never Be Cured ............................................................................................ 11

    C.    There Is No Sanction Other Than Dismissal That Could Effectively Ameliorate the Prejudice to HSS .......................................... 19

        1.    Disqualification of Counsel Is Not Sufficient............................... 19

        2.    Return of Documents and/or Suppression Is Inadequate.............. 20

        3.    Monetary Sanctions Are Not Enough. ......................................... 22

II.    HINDS'S MISCONDUCT CANNOT BE EXCUSED ON THE GROUNDS THAT SHE DID NOT KNOW THE INFORMATION WAS PRIVILEGED AND SHOULD NOT BE COUNTENANCED ON THE GROUNDS OF SOME ALLEGED "NECESSITY" OR OTHER "SELF-HELP" BASIS...................... 23

    A.    Hinds's Contention That Her Conduct Was "Necessary" to Preserve Evidence Is No Excuse for Her Abuse of the Judicial Process ............................................................................................ 23

    B.    Hinds Cannot Claim She Did Not Know the E-mails Were Privileged. ...................................................................................... 25

    C.    Hinds Has Had Her Day in Court. .......................................................... 26

    D.    The Interests of Justice Require Dismissal. ............................................ 27

CONCLUSION.........................................................................................................................27

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Alpha Funding Grp., Inc. v. Cont'l Funding, LLC*,
    Index No. 13784/06, 2008 WL 3823764 (Sup. Ct. Kings Cnty. Aug. 15, 2008) ........14, 19, 22

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989) ..........................................................................................10, 11

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .............................................................................................................9, 10

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*,
    561 F.3d 1298 (11th Cir. 2009) .........................................................................10, 11, 13, 27

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*,
    No. Civ. 1015 2007 WL 247920 (N.D. Ga. Aug. 28, 2007)...........................10, 13, 15, 16, 27

*Fayemi v. Hambrecht and Quist, Inc.*,
    174 F.R.D. 319 (S.D.N.Y. 1997) ...................................................................................10, 14

*Herrera v. Clipper Group, L.P.*,
    Nos. 97 Civ. 560/97 Civ. 561, 1998 WL 229499 (S.D.N.Y. May 6, 1998) ...............23, 24, 25

*Int'l Prods. Corp. v. Koons*,
    325 F.2d 403 (2d Cir. 1963)......................................................................................................10

*Leor Exploration & Prod., LLC v. Aguiar*,
    Nos. Civ. 09-60136/09-60683, 2010 WL 3782195
    (S.D. Fla. Sept. 28, 2010)........................................11, 13, 15, 16, 19, 20, 22, 23, 27

*Lipin v. Bender*,
    193 A.D.2d 424 (1st Dept. 1993).............................................................................................25

*Lipin v. Bender*,
    84 N.Y.2d 572 (1994) ............................................................12, 13, 14, 15, 16, 19, 20, 25, 27

*Matter of Weinberg*,
    129 A.D.2d 126 (1987) ...............................................................................21, 22, 23, 24, 27

*Oliver v. Gramley*,
    200 F.3d 465 (7th Cir. 1999) ...................................................................................................11

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*,
    663 F.2d 371 (2d Cir. 1981)......................................................................................................11

*Republic of the Philippines v. Westinghouse Elec. Corp.*,
   43 F.3d 65 (3d Cir. 1995)........................................................................................................10

## TABLE OF SUPPORTING PAPERS

1.      Defendant's Notice of Motion for Sanctions in the Form of Dismissal of Plaintiff's Lawsuit;

2.      Memorandum of Law in Support of Defendant's Motion for Sanctions in the Form of Dismissal of Plaintiff's Lawsuit;

3.      Affirmation of Amy J. Traub, Esq. in Support of Defendant's Motion for Sanctions in the Form of Dismissal of Plaintiff's Lawsuit and Motion for Protective Order and Immediate Stay of Discovery, attaching the following exhibits:

> **Exhibit A –** A true and correct copy of the Complaint, filed on May 9, 2011;
>
> **Exhibit B** – A true and correct copy of HSS's Answer, Defenses, and Counterclaims Against Plaintiff, filed on July 25, 2011;
>
> **Exhibit C** – A true and correct copy of Plaintiff's "Reply" to Defendant's Counterclaims;
>
> **Exhibit D** – A true and correct copy of a letter from Amy J. Traub, Esq. to Paul P. Rooney, Esq., dated August 30, 2011;
>
> **Exhibit E** – A true and correct copy of letter from Paul P. Rooney, Esq. to Amy J. Traub, Esq., dated September 6, 2011;
>
> **Exhibit F** – A true and correct copy of a letter from Amy J. Traub, Esq. to Paul P. Rooney, Esq., dated September 8, 2011;
>
> **Exhibit G** – A true and correct copy of Plaintiff's Supplemental Responses and Objections to Defendants' [sic] First Set of Interrogatories, signed on April 11, 2012;
>
> **Exhibit H** – A true and correct copy of a letter dated October 20, 2011, from Amy J. Traub, Esq. to Paul P. Rooney, Esq., enclosing a privilege log;
>
> **Exhibit I** – A true and correct copy of the Memorandum of Law in Support of Plaintiff's Counsel's Motion to Withdraw;
>
> **Exhibit J** – A true and correct copy of the Court's January 23, 2012 Order;
>
> **Exhibit K** – A true and correct copy of a letter from Michael J. Borrelli, Esq. to the Honorable Alvin K. Hellerstein, dated December 15, 2011;

**Exhibit L** – A true and correct copy of Plaintiff's Amended Complaint, filed on March 9, 2012;

**Exhibit M** – A true and correct copy of the transcript of the April 2, 2012 hearing; and

**Exhibit N** – A true and correct copy of a joint letter to the Honorable Alvin K. Hellerstein, dated May 1, 2012.

Defendant Hospital for Special Surgery a/k/a New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery ("HSS"), by its attorneys, Epstein Becker & Green, P.C., respectfully submits this memorandum of law in support of its Motion for Sanctions in the Form of Dismissal of Plaintiff's Lawsuit. Following the withdrawal of one counsel and the return/suppression of stolen documents, the case remains tainted, thus warranting the only remedy left to protect the integrity of the judicial process—dismissal.

## PRELIMINARY STATEMENT

Hinds, a former employee of HSS, brings this court action challenging employment decisions made by HSS as to the payment of overtime to her and the elimination of her position. Hinds was hired in May 2010 to work as an Executive Assistant to Mary Kuntz Crow, M.D. ("Dr. Crow") in the Department of Medicine, a new position that HSS deemed exempt under federal and state wage-and-hour laws by virtue of the nature of the duties anticipated for, and expected to be performed in, the role. In October 2010, approximately 6 months after the commencement of her employment, Hinds expressed her opinion that the work she was performing was nonexempt in nature, and thus, she should be paid overtime. HSS immediately converted her position to a nonexempt position (although it disagreed with her characterization of the role) and commenced an investigation into the duties expected of her, the duties being performed by her, and the amount of hours she had been working, as well as, simultaneously, a review of the needs of the department with respect to her position.

The investigation was conducted by outside counsel, the in-house legal department, Human Resources, and the Department of Medicine and included hundreds of attorney-client privileged e-mail communications and other work product containing the mental thought processes, strategy, and legal opinions of counsel as to Hinds's position. Although the

department had higher expectations for the role and higher hopes for Hinds's performance of duties in the Executive Assistant position, HSS ultimately changed the classification of her position from exempt to nonexempt because its investigation revealed that she had not been performing at the level intended for the position.  Additionally, although its investigation revealed that the needs of the department required a higher-level position, given that there already was a lower-level administrative employee in the department, HSS agreed to continue to employ Hinds in the lower-level position she had created for herself, in the hopes that Hinds, who at one time had been a promising hire, would be motivated to take on the higher-level functions HSS believed she was capable of taking on and which were needed to support the department's needs.  HSS then undertook the task of calculating the amount of past due overtime owed to Hinds.  Although it had reason to question the hours reported by Hinds, HSS accepted those hours and paid her $23,868.36 in overtime, plus interest, and continued to pay her overtime on a going-forward basis.  Thereafter, in March 2011, when it became apparent that two lower-level positions were not efficient, necessary, or enough to meet the needs of the department, the Executive Assistant position held by Hinds was eliminated.

Unbeknownst to HSS, beginning in or around September 2011, Hinds somehow gained access to and began reviewing—on a daily basis—the e-mails of her supervisor, Dr. Crow, as well as a coworker, Laughlin Rice ("Rice"), including attorney-client privileged communications, legal advice, mental thought processes, litigation strategy, and other work product.  The communications and work product Hinds saw and then printed, took home, copied, took notes concerning, and/or committed to memory relate to HSS's investigation and handling of her overtime claim and the elimination of her position.  Among those communications and work product were scripts drafted by in-house or outside counsel to be used in meetings with

Hinds.  She saw these scripts, along with the mental thought processes and strategies of HSS and its counsel, well in advance of the meetings she thereafter attended.  She further saw communications from counsel containing advice as to how to respond to certain actions or statements that might be made by Hinds following each meeting, as well as discussions about the options, legal implications, and/or risks of taking certain steps with respect to Hinds's employment.  And then she acted and spoke accordingly.

After seemingly having baited HSS into taking the actions it took with respect to her employment, Hinds filed this lawsuit, claiming that the payment of overtime plus interest to her was not enough—she now wants liquidated damages—and further contending that the elimination of her position—which she surely had a hand in orchestrating—was retaliatory.  Each of the claims in her Complaint, and the additional claim she raises in her Amended Complaint, are predicated upon her knowledge of privileged communications and work product.  Indeed, she quotes directly from privileged communications in her Complaint and Amended Complaint.

Hinds should not be permitted to profit from her flagrant wrongdoing.  The extent to which her misconduct has infected this litigation and the extent to which HSS will be prejudiced because of Hinds's continued failure (and blatant refusal) to play fair, cannot be understated.  The privileged communications and work product that Hinds has seen go to the very heart of her claims and HSS's defenses in this litigation.  Hinds, whether intentionally or not, has used, and will continue to use, this privileged information throughout the litigation: in formulating the claims in her lawsuit, in conversations with her counsel, in her deposition testimony, when she testifies before a jury, in questioning defense witnesses, in seeking discovery, in determining her own strategy for her case, in asserting new claims, and in countering HSS's defense strategies.

There is no question that this case has been poisoned by Hinds's misconduct from the start, and there is no antidote that could be fairly administered by this Court short of dismissal of the action.  Neither disqualification of Hinds's counsel (which has already occurred once in this litigation), nor return/suppression of the documents (which has already been ordered in this case), nor monetary sanctions has ameliorated (or will ameliorate) the prejudice suffered by HSS.  The privileged information is known by Hinds, and she will carry (and has carried) that knowledge into her entire litigation strategy and into her new attorney-client relationship. Additionally, nothing short of dismissal will vindicate the interest of the courts and the public in maintaining the integrity of the judicial process, which process has been completely, and repeatedly, obliterated by Hinds.  Dismissal, therefore, is the only remedy.

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

Hinds was hired by HSS on or about May 10, 2010, to work as the Executive Assistant Dr. Crow in the Department of Medicine.  (*See* Affirmation of Amy J. Traub ("Traub Aff."), Exhibits ("Ex.") A, B.)  While employed by HSS, over the course of approximately four months, Hinds accessed privileged and confidential e-mails of her supervisor, Dr. Crow, and a coworker, Rice, containing the legal advice, mental impressions, and work product of in-house and outside counsel, printed, copied, took notes concerning, and removed these e-mails from HSS premises, and/or committed other e-mails to memory.  (*See id.*, Ex. B ¶¶ 12, 14, p. 10.)  When Hinds filed her Complaint on May 9, 2011, she used the privileged and confidential e-mail communications that she stole to form the basis of her allegations and litigation strategy against HSS.  For example, in Paragraphs 19, 21, and 27 of the Complaint, Hinds quoted directly from e-mails that include advice and counsel rendered by in-house and outside counsel related to the payment of overtime to Hinds, the revision of her job description, and the elimination of her position—the

4

very adverse employment actions about which she complains in her lawsuit.  (*See id.*, Ex. A ¶¶ 19, 21, and 27.)  On July 25, 2011, HSS filed Counterclaims against Hinds based on the fact that Hinds had improperly accessed and stolen privileged and confidential e-mail communications. (*See id.*, Ex. B.)  In her Reply to the Counterclaims, filed on August 15, 2011, Hinds admitted that she had accessed, printed, and removed e-mails from HSS premises.  (*See id.*, Ex. C ¶ 49.)

On August 30, 2011, after having some initial discussions with Hinds's then counsel, Paul P. Rooney, Esq. ("Rooney"), HSS's counsel wrote a letter to Rooney concerning its concern that Hinds had taken, and appeared to have provided to him, privileged and confidential communications and other work product to which she would not have had access through normal discovery channels.  (*See id.* ¶ 6, Ex. D.)  In a letter dated September 6, 2011, Rooney denied that he or anyone at his firm had taken possession of privileged documents but declined to state whether Hinds had possession of HSS's privileged documents and would not disclose whether he had had any discussions with Hinds regarding any privileged documents.  (*See id.* ¶ 7, Ex. E.) Because HSS remained concerned that the entire litigation had been tainted by Hinds's knowledge of its confidential communications and that allowing discovery on the merits to proceed without first addressing the privilege issues would give Hinds and her lawyers an unfair tactical advantage, by way of letter on September 8, 2011, HSS's counsel proposed that the case proceed on a two-tiered discovery track (the first track to address the privilege issue, and the second track to address the merits).  (*See id.* ¶ 8, Ex. F.)

At the Initial Conference, which occurred on September 16, 2011, before the discovery track issues could be addressed, Rooney handed to HSS's counsel a copy of what he represented were the documents Hinds had stolen from HSS and that she had in her possession at that time. (*See id.* ¶ 9.)  Upon defense counsel's initial review of the documents in Court, a few things

immediately became clear: (a) they contained attorney-client privileged communications and work product; (b) they had been tampered with and/or altered by Hinds[1] in that sections of various e-mail chains had been "cut out", pasted elsewhere (sometimes out of order), or otherwise rearranged, while others had entire sections, recipients, or authors deleted altogether; (c) they were incomplete in that they did not include all of the documents that were quoted, verbatim, by Hinds in her Complaint;[2] (d) they were not the original set of documents that Hinds had stolen from HSS.[3]  (*See id.* ¶ 9.)  In response to HSS's counsel's concerns that Rooney had had access to or gained knowledge of privileged communications and work product, Judge Hellerstein directed HSS to prepare a privilege log, describing the privileged nature of the documents in the set provided by Rooney at the Initial Conference, and further ordered Rooney to return to HSS all documents in Hinds's possession.  (*See id.* ¶ 10.)

On or about October 14, 2011, Rooney sent defense counsel a package containing three copy sets of the documents produced at the September 16, 2011 court conference.  (*See id.* ¶ 11.)  Three days later, Rooney sent defense counsel a second package containing another set of documents that Hinds had removed from HSS.  (*See id.*)  Neither the documents provided by Rooney on October 14, 2011, nor the documents provided on October 17, 2011, contain the original, unaltered set of e-mails or all of the documents that were quoted, verbatim, by Hinds in her Complaint.  (*See id.* ¶ 11.)

---

[1] When requested to provide an explanation as to the altered documents and in response to HSS's expressed concerns about spoliation of evidence, Rooney admitted that the documents had, in fact, been altered by Hinds.  (*See id.* ¶ 9, n.1.)

[2] In her supplemental interrogatory responses, Hinds stated that, with respect to an e-mail she quotes, verbatim, in Paragraph 22 of the Complaint, she "observed the communication in e-mails between Dr. Crow and Rice that Plaintiff does not possess."  (*See id.* ¶ 9, n.2, Ex. G, p. 4-5.)

[3] Hinds has never produced the original set of documents from which she created the altered and extracted set of documents, contending she does not have them.  (*See id.* ¶ 9, n. 2.)

On October 20, 2011, HSS provided Hinds with a privilege log, detailing the attorney-client privileged and work product nature of the documents that had been provided by Rooney at the September 16, 2011 court conference.  (*See id.* ¶ 12, Ex. H.)  Four days later, on October 24, 2011, Rooney moved this Court to withdraw as counsel for Hinds based on the fact that he had had "exposure to at least some of the documents" that "appear[ed] to be privileged documents and work product," which privilege and work product protections "had not been waived" by HSS.  (*See id.* ¶ 13, Ex. I, p. 5.)

On October 28, 2011, a status conference was held at which Rooney's motion was addressed.  Judge Hellerstein orally granted the motion[4] and gave Hinds 30 days to find new counsel, but advised the parties that they should agree to a mutual walk-away before new counsel appeared, noting that Hinds's conduct in reading and stealing privileged communications and work product would not be taken lightly and could make litigating the case difficult.  (*See id.* ¶ 14.)  Defense counsel expressed concern that Hinds would simply obtain new counsel and, even without the physical documents, would continue to taint the litigation by virtue of her knowledge.  (*See id.*)  Judge Hellerstein acknowledged that this was a possibility and stated that if this were to occur, HSS should raise it by way of a motion.  (*See id.*)  Following the court conference, per the Court's directive, defense counsel consulted with Rooney regarding a mutual walk-away, but he advised that Hinds was not interested.  (*See id.* ¶ 15.)

On November 23, 2011, Michael J. Borrelli and Bennitta Joseph (of Borrelli & Associates) appeared as new counsel for Hinds.  (*See id.* ¶ 16.)  A conference was held before Judge Hellerstein on December 9, 2011.  (*See id.* ¶ 17.) At the conference, HSS reiterated its concerns that the entire case had been tainted by Hinds's conduct and that if new counsel had not

---

[4] The Court entered the Order, granting Rooney's motion to withdraw, on January 23, 2012. (Traub Aff., Ex. J.)

already become privy to privileged information by virtue of consulting with her client about the case, she would, at some point, become so infected with the privileged information, and the case could never proceed in fairness to HSS.  (*See id*.) In response to HSS's concerns, Judge Hellerstein instructed Borrelli & Associates to write a letter, advising as to whether they had had access to any privileged documents.  (*See id.* ¶ 17.)

On December 15, 2011, Borrelli & Associates wrote a letter stating that the privileged documents had not "been seen by [him] or by anyone in [his] office."  (*See id.,* Ex. K.)  On March 9, 2012, Hinds filed an Amended Complaint, containing quotations to privileged communications and raising new allegations and a new claim that appear to be based on Hinds's mischaracterization of other privileged communications that she read and stole, and purportedly returned to defense counsel.  (*See id.,* Ex. L.)

Thereafter, the parties engaged in written discovery, including the provision by HSS of a new privilege log containing 274 documents comprised of, among other things, e-mail communications containing the advice and counsel of HSS's in-house and outside counsel and other work product relating to the payment of overtime to Hinds, the revision of her job description, and the elimination of her position.  (*See id.* ¶ 20.)  Hinds's counsel objected to the privilege log, in its entirety, and a hearing was held before Judge Hellerstein on April 2, 2012, to address counsel's objections. (*See id*. ¶ 20.)  With the exception of e-mails containing scheduling and logistical matters, which had been inadvertently designated by HSS as privileged, which mistake was immediately corrected, the Court overruled the objections and held that the documents were privileged.  (*See id.*, Ex. M.)

## ARGUMENT

### I. HINDS'S ADMITTED THEFT AND EXPLOITATION OF PRIVILEGED COMMUNICATIONS, WORK PRODUCT, AND CONFIDENTIAL DOCUMENTS WARRANT DISMISSAL OF HER LAWSUIT.

As will be demonstrated below, Hinds's wrongful invasion of HSS's confidential communications containing attorney-client privileged legal advice, mental impressions, litigation strategy, and other work product can never be purged from her memory, making any further litigation of this case by her a flagrant abuse of the judicial process. She should not be permitted to benefit from her admitted theft and exploitation of these communications. Instead, the Court should invoke its inherent powers to dismiss Hinds's lawsuit, as there is no other sanction—not disqualification of her counsel, suppression of evidence, monetary sanctions, nor any other remedy—that could effectively ameliorate the incurable prejudice to HSS caused by her contumacious conduct. The only appropriate sanction is dismissal.

#### A. The Court's Inherent Powers Provide It with the Discretionary Authority to Dismiss Hinds's Lawsuit Based Upon Her Admitted Misconduct.

The United States Supreme Court has recognized the judiciary's broad inherent powers to impose an appropriate sanction for misconduct by litigants that abuse the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991) (holding that remedy of "outright dismissal," while a severe sanction, is "within the court's discretion" pursuant to its inherent authority). Indeed, a court's inherent power derives from its need to "manage [its'] own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43; *see also Int'l Prods. Corp. v. Koons*, 325 F.2d 403, 407-08 (2d Cir. 1963) (*quoting Gumbel v. Pitkin*, 124 U.S. 131, 144 (1888) (It is well-settled that courts have the "inherent 'equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices.'"); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989) ( "[t]he Civil Rules neither completely describe, nor

9

purport to delimit, the district courts' powers," and the "courts retain the inherent power to do what is necessary and proper to conduct judicial business in a satisfactory manner.").

As this Court has held, "[p]ursuant to this inherent authority, a court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the conduct." *Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997).  That authority specifically extends to "sanction[ing] a party who attempts to use in litigation material improperly obtained outside the discovery process," as is the case here, and in fact, "the party's wrongful acquisition of evidence should not be permitted to redound to its benefit in the litigation." *Id*. at 324-25.  Notably, "a court need not . . . find bad faith before sanctioning under its inherent powers: 'since necessity does not depend upon a litigant's state of mind [and therefore] the inherent sanctioning power must extend to situations involving less than bad faith."  *Republic of the Philippines v. Westinghouse Elec. Corp*., 43 F.3d 65, 74 n.11 (3d Cir. 1995) (*quoting Chambers*, 501 U.S. at 59).

Other federal courts have followed suit in this well-established principle of law.  *See e.g., Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298 (11th Cir. 2009) (entering default judgment pursuant to court's inherent power where plaintiff intercepted and stole privileged communications and then attempted to use them to gain improper advantage in litigation)*; Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999) ("dismissal with prejudice is a permissible judicial sanction for fraud on the court"); *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 386 (2d Cir. 1981) ("A federal district court possesses broad inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices."); *Aoude*, 892 F.2d at 1119 ("a federal district judge can order dismissal or default

10

where a litigant has stooped to the level of fraud on the court"); *Leor Exploration & Prod., LLC v. Aguiar*, Nos. Civ. 09-60136/09-60683, 2010 WL 3782195 (S.D. Fla. Sept. 28, 2010) (where defendant gained unfair advantage in litigation by obtaining unauthorized access to privileged e-mail communications of plaintiffs, dismissal pursuant to court's inherent power was appropriate sanction).

There is no question that this Court has ample authority to dismiss Hinds's lawsuit as a result of her incurable misconduct that has tainted the entire judicial process. Anything other than dismissal would severely prejudice HSS, undermine the powers of this Court, and implicitly encourage the kind of misconduct and exploitation engaged in by Hinds that erodes public confidence in the judicial system.

**B.      The Prejudice to HSS Caused By Hinds's Misconduct Has Not Been Cured By the Withdrawal of Her Prior Counsel or the Return/Suppression of the Stolen Documents, and Can Never Be Cured.**

Neither the withdrawal of her prior counsel nor the return/suppression of stolen documents has cured the prejudice to HSS caused by Hinds's misconduct, and HSS will continue to suffer irreparable harm should this litigation continue. Not only did Hinds unlawfully access[5] and repeatedly review the e-mails of her supervisor and a coworker, but she did so in time, as events were occurring, with full knowledge that she was never meant to be privy to the communications she so boldly reviewed, and fully aware that she was reading attorney-client privileged legal advice and work product. Depending upon what she saw, she then is suspected to have master-mindedly adjusted her behavior and conduct in the workplace accordingly, to

---

[5] Hinds contends that she was given free reign to pillage and plow through the e-mail boxes of her supervisor and a coworker. She was not. In fact, while she has produced a peculiar (and suspected to be doctored) document that she believes granted her access to her supervisor's e-mails, she has produced nothing as to her coworker's account. Nonetheless, her access, whether lawful or not, is of no matter or consequence to this motion. It is what she thereafter did and continues to do with that alleged access that has made a mockery of the judicial process and which should not be countenanced.

11

stoke, antagonize, and bait HSS into taking certain actions with respect to her employment.  The information she obtained relates directly to the facts and circumstances surrounding her claims in this lawsuit and formed the basis for her allegations as set forth in her Complaint and Amended Complaint.  Indeed, the insights she gained into HSS's counsel's mental thought processes and strategy with respect to the very adverse actions about which she complains in this lawsuit can never be purged from her memory and will forever taint the conduct of this litigation.  Under these circumstances, the only appropriate remedy is dismissal.  *See Lipin v. Bender*, 84 N.Y.2d 572 (1994).

In *Lipin*, the New York Court of Appeals affirmed dismissal of the plaintiff's employment discrimination claims where she deliberately and knowingly read, stole, and copied attorney-client privileged documents of the defendants which contained, in part, legal advice relating to the plaintiff's termination, and attempted to use the privileged information to gain a tactical advantage in the litigation.  *Id.* at 566-68, 572.  Moreover, just as Hinds did here, after "[h]aving deliberately taken the initial misstep of secretly reading what she recognized as attorneys' confidential documents," the *Lipin* plaintiff took the documents, made photocopies of them, brought them home with her, made notes about some of the documents, and then attempted to use the documents to her advantage in the litigation, all of which exacerbated the harm to the defendants.  *Id*.  Based on these facts, the court affirmed dismissal, finding that "neither suppression of the documents nor suppression of the information was a realistic alternative," since "[p]laintiff's knowledge of course can never be purged" and that "disqualification of plaintiff's counsel [would not] have ameliorated the prejudice" since the "wrongdoing and the knowledge were the client's own, which she would carry into any new attorney-client

relationship."  *Id*. at 572-73.  The *Lipin* reasoning applies to the instant case and squarely supports immediate dismissal.

Further supporting dismissal of Hinds's lawsuit is *Eagle Hospital*, in which an individual defendant intercepted and stole internal, privileged communications between Eagle Hospital's personnel and its attorneys and then attempted to use the privileged communications to gain an advantage in the litigation by attaching them to an affidavit he submitted to the court.  561 F.3d at 1302-03.  The trial court, citing *Lipin* as instructive, concluded that this conduct constituted bad faith and, pursuant to the court's inherent power, struck the individual defendant's answer and counterclaims.  *Id*.; *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc*., No. Civ. 1015 2007 WL 247920, at *7 (N.D. Ga. Aug. 28, 2007).  The court reasoned that because he "had already been privy to privileged information which he could not unlearn and because neither Eagle nor the court could know the extent of [his] activities," dismissal was appropriate.  561 F.3d at 1303.  The Eleventh Circuit affirmed.  *Id*. at 1307.

Similarly, in *Leor*, the defendant gained unauthorized access to one of the plaintiff's e-mail accounts, which contained, among other things, numerous attorney-client privileged communications concerning the case and the disputes between the parties.  2010 WL 3782195, at *2.  Relying on its inherent authority, the court sanctioned the defendant by striking his pleadings, reasoning that "[k]nowledge is power" and that the defendant's access to privileged e-mails "that included counsel's mental impressions, thought processes, legal recommendations, and trial strategy" gave him an "unfair advantage that strikes at the heart of the adversarial system."  *Id*. at *10.  Moreover, the court found irreparable harm to the plaintiffs based, in part, on the fact that "there is no way to know the true extent of [the defendant's] hacking . . . the disruption to the litigation, the abuse of the judicial process, and the fact that [he] cannot

13

'unlearn' what he has seen by accessing [the plaintiff's] emails."  *Id.* at *11.  Finally, the court reasoned that the sanction of dismissal was warranted because it "serve[s] the additional purpose of deterring other litigants from similar conduct, which helps protect the judicial process from abuse."  *Id.* at *12; *see also Fayemi*, 174 F.R.D. at 326 (dismissal is appropriate remedy where disclosure of privileged material provides wrongdoer with information she would not have otherwise obtained through normal discovery process and "could not be unlearned"); *Alpha Funding Grp., Inc. v. Cont'l Funding, LLC*, Index No. 13784/06, 2008 WL 3823764, *5 (Sup. Ct. Kings Cnty. Aug. 15, 2008) (dismissal of plaintiff's complaint was only remedy where individual defendant, who was later hired as employee of plaintiff, had knowledge of privileged communications and litigation strategies of corporate defendant, which made order of suppression impossible since individual defendant's knowledge of such litigation strategies "simply cannot be purged").

Here, it is undisputed that Hinds deliberately and intentionally accessed Dr. Crow's and Rice's e-mails and read privileged and confidential communications containing the legal advice, strategies, thought processes, and mental impressions of both in-house and outside counsel that were contained therein.  (*See* Traub Aff., Exs. B, C, H, and I.)  Like the plaintiff in *Lipin*, rather than minimize the harm to HSS, once she realized the communications were confidential, privileged, and unquestionably not for her eyes, she did not stop reading.  Instead, she continued her scheme of misconduct for four months, printed communications usually within a day or two of them being sent, took them home, photocopied them, committed some to memory, and took notes regarding others.  Just like the plaintiffs in *Lipin*, *Eagle Hospital*, and *Leor Exploration*, Hinds's knowledge "can never be purged."

14

Even worse than *Lipin*, which only involved post-litigation theft of privileged information, Hinds also stole HSS's privileged communications as they were occurring, which undoubtedly contaminated and influenced her statements and actions during the last four months of her employment. Indeed, she apparently used her knowledge of HSS's confidential and privileged communications about her employment status, her overtime claim, and the revision of her job description to bait HSS into eliminating her position by taking it upon herself to re-craft it into a lower-level position that she knew from her review of privileged e-mails would not satisfy the needs of the department. In short, she used her ill-gotten knowledge to bait HSS and set it up for a retaliation lawsuit. For example:

- Hinds knew exactly what Dr. Crow intended to say about her exempt status and the proposed strategies being discussed for how to handle various conversations with Hinds. (*See* Traub Aff., Ex. H (11/22/10, 2:14 p.m. and 11/30/10, 7:28 p.m. e-mails.))[6]

- Hinds knew that HSS was assessing the needs of the department and what it might be forced to do if she refused to perform the job responsibilities it had originally intended for the position and which were ultimately deemed necessary for the department. (*See id.*, Ex. H (11/22/10, 2:14 p.m. e-mail; 11/30/10, 7:28 p.m. e-mail; 12/9/10, 1:46 p.m. e-mail; 2/9/11, 12:00 a.m. e-mail; 2/9/11 1:50 p.m e-mail and attachment.)) And then, not coincidentally, she refused to perform those responsibilities, knowing full well what the consequence of that refusal might be.

- Hinds reviewed confidential communications regarding a revised job description for her position, drafted by an attorney at Proskauer Rose, which included a clearer recitation of exempt functions that had always been intended for the position. (*See id.*, Ex. H (11/30/10, 5:28 p.m., 11/30/10, 6:04 p.m., 11/30/10, 6:37 p.m., and 11/30/10, 7:12 p.m. e-mails.)) And then, not by chance but by virtue of seeing what she saw, including the legal assessment of which of her functions might be viewed as exempt under the law, she rejected those functions, knowing what might be the consequence of her actions.

- Hinds knew exactly what Human Resources planned to say to her regarding her overtime claim, as she had possession of the script that had been drafted by

---

[6] HSS is willing to provide the Court with the attorney-client privileged e-mails referenced herein should the Court wish to review (or re-review, as the case may be for the e-mails it reviewed at the April 2, 2012 hearing) any of them *in camera*.

outside counsel for this conversation.  (*See id.*, Ex. M (1/10/11, 9:00 a.m. e-mail with attached script and 1/10/11, 12:24 p.m. e-mail.))

- Hinds reviewed confidential communications between Dr. Crow, Rice, in-house counsel, and outside counsel and their subsequent work product containing opinions and strategies as to Hinds's continued employment, which were prepared in anticipation of litigation.  (*See id.*, Ex. M (2/9/11, 12:00 a.m. e-mail and 2/9/11, 1:50 p.m. e-mail and attachment.)

In short, Hinds's knowledge of HSS's confidential and privileged legal advice, strategies, opinions, scripts, and drafts, as they were happening, makes it impossible to ever know how the events and occurrences of Hinds's employment, and her termination thereof, would have unfolded had she not been privy to these communications.  Accordingly, the parties simply cannot litigate this matter at arm's length.

But the story does not end there.  Exactly like the plaintiffs in *Lipin*, *Eagle Hospital*, and *Leor Exploration*, after Hinds stole privileged information to which she never would have been entitled in discovery, she then consciously used the information to gain a tactical advantage in this lawsuit.  Specifically, Hinds used the stolen, privileged communications to craft the allegations that form the basis of her entire lawsuit and even quoted three of the privileged e-mails in her original Complaint.  (*See* Traub Aff., Ex. A ¶¶ 19, 21, 27.)  After Hinds's original counsel conceded that he had seen and taken possession of attorney-client privileged communications, purportedly returned all copies of same to defense counsel, and voluntarily withdrew as counsel, Hinds's new counsel filed an Amended Complaint, containing quotations to the exact same privileged e-mails and containing the exact same allegations as the original Complaint, thus establishing that Hinds continues, and will continue, to use her knowledge of the privileged communications to gain advantages in this lawsuit, irrespective of any return of documents or substitution of counsel.  (*See id.*, Ex. L ¶¶ 19, 21, 27.)

16

Indeed, HSS has legitimate and serious concerns that several litigation strategies recently advanced by Hinds in this litigation demonstrate that she continues to use her knowledge of the stolen, attorney-client privileged communications to gain advantages in this litigation; that she has not disclosed all of the communications to which she has actually been privy; and that she has infected her new counsel with the same privileged and confidential knowledge as her original counsel.   While her counsel has maintained that she does not believe she has "seen" any privileged documents, the arguments she has posited in this lawsuit and the discovery disputes she has initiated make it clear that she is obtaining the privileged information one way or another, whether she is conscious of it or not.[7]

Specifically, in the Amended Complaint (filed after the stolen communications allegedly were returned), Hinds, through counsel, asserted a new retaliation claim based on allegations that Dr. Crow and Rice "were conspiring to deny Plaintiff overtime pay, to retaliate against Plaintiff for seeking overtime pay and to destroy evidence of their unlawful acts."   (*Id.*, Ex. L ¶ 46.)   It appears that Hinds's spurious assertion of a "conspiracy" is being driven by her own interpretation, and a complete mischaracterization, of HSS's privileged communications relating to payment of overtime to Hinds and the elimination of her position.   In order for her lawyers to have crafted this new claim, Hinds must have shared the content and substance of those privileged communications and attached her own meaning to them.   These new allegations, therefore, make clear that notwithstanding Hinds's return of the stolen documents and her

---

[7] HSS is not, at this time, seeking sanctions against Hinds's counsel, and it need not do so in order to address the issue at hand.  Indeed, a lawyer who contends that she has never "seen" privileged documents can be a perfect front, but that does not shield her client.  While counsel may very well have used her best efforts to avoid the discovery of privileged, tainted communications and strategy, there is no question that she is learning this information anyway. The bad faith in this case, and the reason it cannot be litigated in fairness, started with Hinds, and it is Hinds's bad faith that HSS seeks to sanction, pursuant to well-established law.

original counsel's withdrawal, Hinds's knowledge of HSS's privileged communications, on the very issues that underlie her lawsuit, continues to infect and taint this litigation.

Hinds should not be entitled to invade HSS's privileged and confidential information and then use the fruits of that invasion to assert new allegations and claims and gain inevitable advantages over HSS in this lawsuit.  Moreover, Hinds's continued knowledge and use of the privileged information she saw places HSS in the untenable and prejudicial position of defending statements made in the course of its highly confidential and protected attorney-client relationship, thereby forcing HSS to place such communications in issue and potentially disclose those communications, in order to defend this action.

Finally, because the termination of Hinds's employment seemingly was occasioned by her knowledge of privileged communications, mental impressions, strategies, and scripts about her employment, job description, and overtime claim, depositions in this matter simply cannot be conducted.  While HSS has made good faith efforts to abide by the Court's discovery deadline by conducting written discovery and at least scheduling depositions, HSS sees no way that Hinds or any other witness could ever be deposed without the divulgence of HSS's confidential information, whether intentional or not.  As detailed above, Hind's knowledge of HSS's confidential communications with its legal counsel influenced the very conduct that gave rise to her claims.  She should not be permitted to further exploit that knowledge through any judicial process.

As set forth herein, the prejudice already suffered by HSS, and which it will continue to suffer, as a direct result of Hinds's conduct is severe, warranting dismissal of her lawsuit.

**C.    There Is No Sanction Other Than Dismissal That Could Effectively Ameliorate the Prejudice to HSS.**

There is no sanction, absent dismissal, that can adequately remedy the harm caused by Hinds's access to, and removal of, HSS's attorney-client privileged communications and work product containing counsel's mental impressions, strategies, thought processes, and legal opinions.  Disqualification of counsel and return/suppression of the stolen documents has not solved the issue.

**1.    Disqualification of Counsel Did Not, and Will Not, Remedy the Harm.**

As courts have recognized, disqualification of Hinds's counsel cannot ameliorate the prejudice to HSS because the "wrongdoing and the knowledge [a]re the client's own, which she would carry into any new attorney-client relationship."  *Lipin*, 84 N.Y.2d at 573; *see also Alpha Funding,* 2008 WL 3823764, at *5 (dismissal of plaintiff's complaint was only remedy where individual defendant had knowledge of privileged communications and litigation strategies of corporate defendant and such knowledge was retained by plaintiff and would inevitably be carried into any new attorney-client relationship); *Leor Exploration,* 2010 WL 3782195, at *13 (neither disqualification of defendant's counsel, nor suppression, monetary sanctions, or any combination of these and other proposed remedies could "make Aguiar unlearn the information he has gained through his unauthorized access of [the plaintiff's] attorney-client privileged e-mails).

Indeed, the history of this litigation demonstrates that disqualification of counsel is not a sufficient remedy.  Hinds's prior counsel, adhering to his ethical obligations, voluntarily withdrew from this lawsuit, recognizing the problems inherent in pursuing his representation of Hinds.  And yet, Hinds was able to find new counsel and, through new counsel, continues to use her ill-gotten knowledge of HSS's attorney-client privileged communications and work product

to gain an unfair advantage in this litigation.  She clearly has demonstrated that a change of counsel is an ineffective remedy, as her independent knowledge can never be purged, and she intends to use it, and has used it, to drum up additional claims and arguments and affect litigation strategy.  Thus, dismissal of her case is necessary to support the interests of justice.  *See Lipin*, 84 N.Y.2d at 572; *Leor Exploration*, 2010 WL 3782195, at *13.

### 2.    The Return/Suppression of Documents Did Not Solve the Issue.

Additionally, the return/suppression of stolen documents did not solve the issue.  It is now apparent from discovery that the extent to which this litigation is infected by Hinds's access and review of HSS's privileged communications will never truly be known.  First, as the Court is aware, dozens of altered documents (by what appears to be a cut-and-paste method) and e-mails that had entire sections deleted from them or that had been separated and rearranged on a page out of order were contained in the set of documents provided to defense counsel by Hinds's prior counsel in September 2011.  Prior counsel advised HSS's counsel and the Court that his client had purposefully hacked apart the documents, perhaps believing that if she did so she could no longer be accused of possessing privileged documents.  But curiously, to date, Hinds has never produced the original set of documents from which she created the altered and extracted set. [8] (Traub Aff. ¶¶ 9, 11.)  HSS, therefore, will never know the full extent of Hinds's knowledge with respect to the attorney-client communications that she could potentially use in this litigation.

Second, when Hinds did not produce an e-mail between Dr. Crow and Rice that she directly quotes in Paragraph 22 of the Complaint, HSS asked Hinds to identify the source of the

---

[8] Hinds has never explained her failure to produce this original set of documents and has merely stated that all "relevant" documents have been produced.  (Traub Aff. ¶¶ 9, 11.)  Hinds clearly destroyed the documents after filing her lawsuit, thereby spoliating evidence, which, in and of itself, is reason to dismiss her lawsuit.  To the extent the Court does not grant HSS's Motion for Protective Order and an Immediate Stay of Discovery, filed contemporaneously heretin, which HSS believes is necessary to ensure fairness and conserve Court and counsel resources, HSS separately intends to move to compel production of Hinds's computer devices and for sanctions related to her spoliation of evidence.

allegation.[9]   (*See id.*, Ex. G, p. 4.)  Hinds stated that she "observed" the communication she quotes verbatim but that she does not have the e-mail, making it clear that when she gained access to the privileged communication, she either committed it to memory or, more likely, printed it and other communications but later destroyed them—further evidence of spoliation. (*See id.*, Ex. G, p. 4-5.)  Again, HSS will never truly know which communications Hinds is aware of (and could potentially use in this litigation).  Since the extent of Hinds's knowledge is only known by her and such knowledge "can never be purged," it is impossible to put any remedies or walls in place to bar her use of this information in the litigation.

Indeed, the ordered return/suppression of the stolen documents has proven to be insufficient, as the communications Hinds viewed, and apparently committed to memory, could never have otherwise been discovered through an arm's-length discovery exchange and clearly cannot be purged from her mind.   "[W]hile documents may be effectively suppressed, the information gathered from them cannot be so easily contained" because "there is no way of assuring that the tainted knowledge will not subtly influence . . . future conduct of the litigation." *Matter of Weinberg*, 129 A.D.2d 126, 142 (1987).  Moreover, "constantly tracing the provenance of the information . . . to determine if it is really obtained from an independently developed, unrelated, non-privileged, unsuppressed source" is not reasonable."   *Id*. (disqualifying counsel where plaintiff was not infected by attorney's misconduct) (internal quotations omitted).

Furthermore, suppression of such documents and information has not been effective because Hinds's knowledge of the privileged communications is not confined to only one

---

[9] Hinds quotes a lengthy e-mail, verbatim, in the Complaint and the Amended Complaint yet insists that she merely "observed" it and did not take any notes regarding the language of the e-mail.  Given the language of the e-mail, and the fact that Hinds printed and removed hundreds e-mails from HSS, HSS finds it virtually impossible that she did not at one point possess a copy of this e-mail, but rather, committed it to perfect memory.  Even if she did (which is highly doubtful), her memory of this e-mail further underscores the main point of HSS's motion to dismiss – that regardless of any walls the Court puts in place to shield Hinds's use of HSS's privileged strategies, scripts, mental impressions, and thought processes, her knowledge of this information can never be purged, and she will use it to her advantage in prosecuting her claims.

21

particular document or communication; rather, her knowledge permeates HSS's entire defense to Hinds's claims.   She can never "unlearn the information [she] has gained through [her] unauthorized access of . . . attorney-client privileged e-mails."   *Leor Exploration*, 2010 WL 3782195, at *13; *Lipin*, 84 N.Y.2d at 572-73 ("Clearly neither suppression of the documents nor suppression of the information was a realistic alternative."); *Alpha Funding Grp., Inc.,* 2008 WL 3823764, at *5 ("Due to the nature of the communications disclosed, [the] case [did] not lend itself to the mere suppression of information as a realistic alternative" as the disclosure which occurred "permeates the entire defense" and "there is no way for the court to suppression the information" since Gary Kanfer's "knowledge simply cannot be purged").   Simply put, the bell cannot be unrung.

### 3. Monetary Sanctions Would Not Be Enough.

Finally, monetary sanctions would be insufficient to remedy the irreparable harm suffered by HSS and would do nothing to eliminate the prejudice HSS will continue to suffer by having to defend claims based on Hinds's full knowledge of its litigation strategies and defenses.   Ordering monetary sanctions would simply send a message that money can cure an abuse of the judicial process, which is untrue.   Further, monetary sanctions would do absolutely nothing to deter other litigants from viewing the theft of privileged communications simply as a "cost of litigation" that can easily be overcome by paying a sanction.   Indeed, for that very reason, monetary sanctions have been rejected by courts in similar cases, and such sanctions should similarly be rejected here.   *See e.g., Leor Exploration,* 2010 WL 3782195, at *13 (neither monetary sanctions nor other remedies "can remedy the disruption to the litigation process or the lack of respect to the judicial process").

## II.   HINDS'S MISCONDUCT CANNOT BE EXCUSED ON THE GROUNDS THAT SHE DID NOT KNOW THE INFORMATION WAS PRIVILEGED AND SHOULD NOT BE COUNTENANCED ON THE GROUNDS OF SOME ALLEGED "NECESSITY" OR OTHER "SELF-HELP" BASIS.

### A.   Hinds's Contention That Her Conduct Was "Necessary" to Preserve Evidence Is No Excuse for Her Abuse of the Judicial Process.

Hinds admits that she reviewed, printed, and removed attorney-client privileged e-mail communications, but she attempts to justify her wrongful conduct by arguing that such actions were "necessary" "to preserve evidence" and to "prevent the destruction of evidence." (*Id.*). Such an argument is frivolous and is no excuse for her abuse of the judicial process. *See Herrera v. Clipper Group, L.P.*, Nos. 97 Civ. 560/97 Civ. 561, 1998 WL 229499, at *1 (S.D.N.Y. May 6, 1998); *Matter of Weinberg*, 129 A.D.2d at 140. Indeed, attorney-client communications and work product are not admissible evidence.

In *Herrera*, an employment discrimination case, the plaintiff admitted to making copies of documents from the defendants' desk files, internal mail, and manager desk drawers while in the defendants' employ, to "collect evidence for [her] suit." 1998 WL 229499, at *1. In response to the defendants' motion for sanctions, the plaintiff argued that she was justified in appropriating her employer's files for her personal use because such documents were not actually confidential and her conduct was "necessary" to prevent "defendants' covert destruction of documents relevant to her claim." *Id*. at *3. Judge Scheindlin held that "[t]he discovery process is not meant to be supplemented by the unlawful conversion of an adversary's proprietary information" and that "plaintiff's behavior was not the product of a momentary lapse of judgment, but of a calculated strategy, carried out over an extended period." Id. at *2. As such, the plaintiff's conduct demonstrated "contempt for the discovery process, as well as for

plaintiff's duty of loyalty to her employer,"[10] and sanctions were appropriate.  *Id*.  In response to the plaintiff's argument that the documents were not actually confidential because the plaintiff had access to them, the Court held that plaintiff's "novel theory" that "anything not nailed down can be permissibly stolen" was without merit and reasoned that "'[s]imply because [plaintiff] had a key, did not take originals . . . and had work-related access to the documents does not mean that she was authorized to copy the documents, remove them from [the] office and give them to her attorneys.'"  *Id*. (*quoting Furnish v. Merlo*, No. 93 Civ. 1052, 1994 WL 574137, at *6 (D. Or. Aug. 29, 1994)).  The Court further rejected the plaintiff's rationale that her actions were made necessary by the defendants' destruction of documents, as the plaintiff had presented no evidence whatsoever that such destruction had occurred.  *Id*. at *3.

Similarly, in *Matter of Weinberg*, the petitioner argued that he should be permitted to use information his lawyers improperly obtained because the information was necessary to demonstrate the "fraud upon him and upon the court."  129 A.D.2d at 140.  The First Department held that "the interests of justice compel nothing more than that discovery be conducted according to the rules and within the limitations in [the procedural rules]," and "petitioner acquires no special right to the disclosure of privileged information by claiming that it will be helpful or even necessary to the proof of his case."  *Id*.  Indeed, "if the information sought is in fact privileged, it is not subject to disclosure no matter how strong the showing of need or relevancy."  *Id*. (*quoting Cirale v. 80 Pine St. Corp*., 35 N.Y.2d 113, 117 (1974)).

Here, there is no dispute that the documents and information that Hinds reviewed, printed, copied, and removed from the premises of HSS contains HSS's legal strategy, advice, mental impressions, work-product, scripts of conversations, chronologies, and versions of events,

---

[10] Among other counterclaims, HSS has asserted a counterclaim against Hinds under the faithless servant doctrine based on her blatant breach of her duty of loyalty.  (Traub Aff., Ex. B, p. 9-12.)

24

all of which are protected by the attorney-client privilege and/or work product doctrine.  (*See* Traub Aff., Exs. C, H, I.)  Hinds, therefore, would not be entitled to this information through normal discovery channels, and she cannot argue that her misconduct was "necessary" to establish her claims.   Similarly, Hinds has absolutely no evidence whatsoever that any documents relating to her claims were destroyed, and, in fact, they were not.  Hinds, therefore, has no basis whatsoever to assert that her misconduct was justified.  Like the plaintiff in *Herrera*, Hinds engaged in a "calculated strategy, carried out over an extended period" of time, while still employed by HSS, for the sole purpose of engaging in "self-help" and to bait HSS into a lawsuit. Litigation, of course, is "not a street fight," and Hinds's unlawful conversion of HSS's attorney-client privileged information cannot be condoned.  *Herrera*, 1998 WL 229499, at *2.  For these reasons, Hinds's baseless justifications for her misconduct cannot save her lawsuit.

**B.      Hinds Cannot Claim She Did Not Know the E-mails Were Privileged.**

Hinds also cannot reasonably claim that she did not know the communications she stole were protected by the attorney-client privilege.  First, *Lipin* makes clear that the same result would be appropriate even if the documents at issue in that case were not privileged, as "the highly improper manner in which [the documents] were obtained, combined with their subsequent use . . . to defendants' detriment" constitutes a sufficient basis for dismissal.  *Lipin v. Bender*, 193 A.D.2d 424, 428 (1st Dept. 1993); 84 N.Y.2d at 570.  Second, a comparison of the documents stolen by Hinds versus HSS's actual documents demonstrates that she tried to cover up her egregious misconduct by deleting portions of certain e-mail communication chains to make it falsely appear to her prior counsel and to the Court as if she had not stolen privileged communications and work product.  (*See* Traub Aff. ¶ 9, n. 1; Ex. H (11/30/10, 4:33 p.m., 5:28 p.m., 6:04 p.m., 6:37 p.m., and 7:12 p.m. e-mails.))  Third, many of the e-mail communications

25

contain communications such as, "Connie [HSS's in-house counsel] and the lawyer finally agreed . . .;" "[t]he lawyer emphasized . . .;" and "the lawyer wants us," making it clear that the e-mails, *on their face*, were discussing and relaying the legal advice of in-house and outside counsel.  (*See id.*, Ex. H (11/30/10, 7:12 p.m. e-mail.))  Fourth, such an argument cannot explain Hinds's continued use of the stolen communications following the retention of new counsel, when Hinds is well aware that her former counsel's withdrawal and return of the documents were intended to cure this very issue.  Thus, she cannot claim she had no knowledge or understanding of the privileged nature of the documents.

> ### C.    <u>Hinds Has Had Her Day in Court.</u>

HSS anticipates that Hinds will also argue that dismissal is unwarranted because she is entitled to her day in court.  These considerations, however, do not excuse her wrongful invasion of HSS's privileged and confidential communications (a sacrosanct relationship in our judicial system that is subject to strict ethical and legal limitations upon use and disclosure), her disloyalty to her employer, baiting her employer into a retaliation claim, and then exploiting her ill-gotten gains to gain tactical advantages in her lawsuit.  Moreover, notwithstanding Hinds's insistence that HSS undertook a "conspiracy" to not pay her overtime, after Hinds claimed that she was entitled to overtime, HSS immediately commenced an investigation and ultimately paid Hinds for all of the retroactive overtime she claimed to be owed, through and including the time period of the investigation, plus interest.  (*See* Traub Aff. Ex. A, ¶ 31.)  Hinds got what she wanted—overtime pay—and has, therefore, had her day in court and has not suffered any egregious     harm     that     could     possibly     justify     her     misconduct.

### D.     <u>The Interests of Justice Require Dismissal.</u>

Finally, the severe prejudice that HSS has suffered, and will continue to suffer, if this lawsuit continues, is not the only interest at play here.  Hinds's conduct demonstrates a complete disregard for the integrity of the judicial process, the notion of "fair play," and the attorney-client relationship generally.   The Court's "principal concern under the circumstances must be to preserve the integrity of the process by which rights are vindicated."  *Matter of Weinberg*, 129 A.D.2d at 144.  "It is serious enough when client privilege is compromised, but when the information obtained as a consequence is then put to use in legal proceedings to prejudice one of those whose confidences have been revealed," a party must be sanctioned.   *Id.* at 143. Therefore, just as in *Lipin*, *Eagle Hospital*, and *Leor*, "permitting this case to continue would be an open invitation to others to abuse the judicial process."  *Eagle Hospital,* 561 F.3d at 1306. Dismissal, therefore, is necessary "to act as a deterrent to other litigants contemplating improper interception of communications between clients and their attorneys."  *Id*.

### <u>CONCLUSION</u>

For the reasons set forth above, HSS respectfully requests that the Court grant its motion and enter an order dismissing this lawsuit in its entirety with prejudice.

Dated:    June 15, 2012

                              *Respectfully submitted,*

                              EPSTEIN BECKER & GREEN, P.C.

                              /s/ Amy J. Traub
                              Amy J. Traub
                              Jill Barbarino
                              250 Park Avenue
                              New York, New York 10177
                              Phone: 212.351.4500

*Attorneys for Defendant Attorneys for Defendant Hospital for Special Surgery a/k/a New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery*